JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
GABRIELA BISCHOF, Bar No. 324731
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:  (415) 436-7700
Facsimile:  (415) 436-7706
Email:     Gabriela_Bischof@fd.org

Counsel for Defendant Salamanca-Benitez

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 22–397 JSC |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| JESUS SALAMANCA-BENITEZ, | Court: Courtroom 8, 19th Floor<br>Hearing Date: September 3, 2025<br>Hearing Time: 10:00 a.m. |
| Defendant. | |

## INTRODUCTION

Jesus Salamanca-Benitez's crime is serious: he brokered the sale of 13,110.9 grams of actual methamphetamine and 106 grams of fentanyl, while still on supervised release for his prior drug offense. The parties agree that the applicable guidelines are total offense level 37 and criminal history category II, resulting in a guideline range of 235-293 months, a sentence fit for a drug kingpin. But Mr. Salamanca-Benitez is no kingpin. The year before he brokered these sales to the confidential source, he was working at a Panda Express and living with his cousin, doing home repairs in exchange for free rent. During the six months he brokered the three buys, he had relapsed and was in the throes of a gambling addiction. As the recorded calls bear out, the buys involved

methamphetamine and later fentanyl on loan to him from friends in the drug world, and no weapons, threats, or violence. He was clearly no high level manager: he couldn't find a single person willing to drive the methamphetamine to the buyer for weeks.

His enormous guideline range springs largely from the disparity in offense level between actual methamphetamine and "a mixture or substance containing methamphetamine." If the DEA had not opted to test the methamphetamine for purity, his total offense level would be 33, and his guideline range would be 151-188 months, <u>7 to nearly 12 years</u> less than the actual meth guideline. The Court should reject the distinction between actual and mixed methamphetamine as a policy matter because there is no rational basis to distinguish between the two: seized methamphetamine has been uniformly pure for over fifteen years and thus possession of pure meth is not unusual and does not indicate a higher degree of control within the distribution chain; and pure methamphetamine is not necessarily any more dangerous than mixed methamphetamine.

There are also inequities here beyond the actual vs. mixed methamphetamine disparity. As set forth below, drug quantity is much less probative of culpability now than it used to be. Due to an oversupply of methamphetamine in the drug market, methamphetamine is now wildly inexpensive – down from $270 per gram in 2007 to $2-3 per gram in this case, and because methamphetamine is chemically -rather than botanically - derived, any methamphetamine that is lost can be quickly manufactured and replaced. This explains why friends were willing to loan a person like Mr. Salamanca-Benitez such a large amount of methamphetamine to facilitate the sales to the confidential source: even if the drugs were seized by police or he ran off with them, they could be replaced for next to nothing.

Moreover, a sentence of 96 months will address "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Meth, both pure and mixed, is punished out of step with other drugs of similar seriousness. One gram of pure meth is punished equal to 100 grams of cocaine, 20 grams of heroin, 8 grams of fentanyl, and 5.6 grams of crack. One gram of mixed meth is punished 10 times more harshly than cocaine and twice as harshly as heroin. Perhaps in light of these disparities, nationwide sentencing data for mixed methamphetamine guidelines of offense level 33 and criminal history

category II reveal an average sentence of 118 months. Finally, Mr. Salamanca-Benitez requests that the Court consider a further variance in light of his disadvantaged youth and youth at the time of this offense.

Mr. Salamanca-Benitez's crime is serious, but 96 months is a serious sentence. Eight years is more than a quarter of his life at this point, and he will serve more than double the time he served on his only prior case. Such a sentence is sufficient, but not greater than necessary to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

## BACKGROUND

### A.  Childhood and Youth

Mr. Salamanca-Benitez was born in the United States but raised in Michoacan, Mexico. PSR ¶ 30, 40. His father was a violent alcoholic, who abused him, his brother, and his mother. ¶ 42. His parents divorced when his younger brother was born. ¶ 41. Mr. Salamanca-Benitez was 11. Thereafter, his father's alcoholism led to the loss of his job, and his mother was not employed. ¶ 41. Money was scarce, and Mr. Salamanca-Benitez left home as soon as he turned 18 to try to make his way in the world and provide support for his mother. ¶ 40. He came to the United States, where he had extended family. *Id*.

When he was 18, he first became involved in drug trafficking and was involved until his 20th birthday. ¶ 31. Thereafter, he was arrested and ultimately sentenced to 50 months imprisonment in 2017. *Id*. He successfully completed RDAP for a sentence reduction and moved to Arizona upon release from prison. *Id*.

### B.  Offense Conduct

In 2019, Jesus Salamanca-Benitez was working in a Panda Express and living with his cousin, doing home improvement projects in exchange for rent. ¶ 40; 53. Shortly before the pandemic, he received permission to move back to Mexico, which was a disastrous decision for him. ¶ 31. He relapsed, started using drugs and gambling heavily. ¶ 48, 50. He would often lose so much money that he had no money to buy food the following day. ¶ 48. Soon he was hanging around bad influences regularly, and desperate for money.

The confidential source ("Individual 1") was a known methamphetamine and other drug distributor in the Bay Area, who reached out to Mr. Salamanca-Benitez after the death of another drug dealer, a mutual friend. ¶ 7. Mr. Salamanca-Benitez saw an opportunity to make some fast money by brokering the sale of methamphetamine to Individual 1. In March 2021, Mr. Salamanca-Benitez convinced friends with connections to front him methamphetamine to show to Individual 1, so that he could line up a sale and take a cut. ¶ 8, fn. 1 ("they lent it to me, those that I have? They let me borrow that so you can see").

Although he admitted to Individual 1 that he was broke and penniless, Mr. Salamanca-Benitez tried to present himself to Individual 1 as connected and in the know. ¶ 8-9. Still, Mr. Salamanca-Benitez couldn't find anyone willing to drive the 4400 grams of methamphetamine to the Bay Area. When he did, the first driver claimed his car broke down and cancelled. Individual 1 had to pay extra money to convince another man to take the drugs. ¶ 9. That courier was intercepted by law enforcement on April 16, 2021 near Gilroy. ¶ 10. The weight of the actual methamphetamine seized was 4,285.9 grams; the weight of the meth mix was 4,418.5 grams. ¶ 10. The price, including the courier's payment, was around $3 per gram.

In August 2021, Mr. Salamanca-Benitez brokered the sale of more methamphetamine to Individual 1, which was transported by a courier from Mexico to Redwood City. The weight of the actual methamphetamine he distributed was 8,825 grams. ¶ 11. The price for this shipment was around $2 per gram. *Id.*

Finally, in September 2021, Mr. Salamanca-Benitez sold 1,000 M-30 pills containing fentanyl to Individual 1 for $4,500. ¶ 12. After the dropoff, he called Individual 1, asking for the remaining money from the August methamphetamine sale: ""[p]lease, dude, get me another paper around there, because I need it. I'm all spent." *Id*.

At the time of the sales, Mr. Salamanca-Benitez was 27 years old. After his arrest, he has been incarcerated for the most part in Santa Rita Jail, where he works full time in the kitchen and on the maintenance crew. ¶ 45.

# ARGUMENT

## I. The Court Should Reject The Baseless Distinction Between Pure and Mixed Methamphetamine

The extreme 10-to1 disparity between the mixed-meth and pure-meth base offense levels is irrational and creates unwarranted disparities between similarly situated individuals convicted of meth offenses.[1] As set forth below, Congress and the Sentencing Commission's primary justification for creating disparate penalties between pure and mixed methamphetamine was that possession of unusually pure substances should indicate a higher level in the distribution chain. This justification was not empirically sound in the 1980s and 90s when the pure and mixed guidelines were first introduced, but it is especially inconsistent with the state of the illicit methamphetamine industry over the last 20 years. Moreover, there is no pharmacological basis to distinguish actual and mixed methamphetamine. They have the same chemical structure, and adulterants may render mixed methamphetamine *more* dangerous than actual methamphetamine. For these reasons, a significant number of district courts have declared a categorical policy disagreement with the purity-driven methamphetamine guidelines.

### A. District Courts Can And Have Rejected The Actual Methamphetamine Guidelines On Policy Grounds

In determining a sentence that is sufficient, but not greater than necessary, district courts may "not presume that the guideline range is reasonable." *Gall v. United States*, 522 U.S. 38, 49-50 (2007). Rather, sentencing courts must consider whether a guideline sentence is improper either because "the Guidelines reflect an unsound judgment," or otherwise fail to properly reflect the purposes of sentencing set forth in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 357 (2007). District courts can categorically vary from the guideline-established range based solely on a disagreement with the policy underlying a guideline. *Spears v. United States*, 555 U.S. 261, 264 (2009). A court's decision to vary from the Guidelines is especially sound where the guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough v. United States*, 552

---

[1] *See* 18 U.S.C. § 3553(a)(6) (instructing courts to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct" when imposing sentence).

DEF. SENT MEMO
*SALAMANCA-BENITEZ*, CR 22–397 JSC

U.S. 85, 109 (2007) (finding it was not an abuse of discretion to conclude "that the crack/powder disparity yields a sentence "greater than necessary" to achieve § 3553(a)'s purposes, even in a mine-run case."). In other words, where the Commission failed to base its guideline determinations "on empirical data and national experience" to achieve a sentencing range that roughly achieves the purposes of sentencing set forth in 18 U.S.C. § 3553(a), a "court's decision to vary . . . may attract greatest respect." *Id*.

A growing number of district courts have rejected the distinction between actual and mixed methamphetamine and relied on the fact that § 2D1.1 treats methamphetamine far more harshly than non-meth drugs in the absence of evidentiary support for such treatment, in imposing below-guideline sentences in meth cases.[2] This Court should join them.

---

[2] *See United States v. Havel*, 2023 WL 1930686, at *5 (D. Neb. Feb. 10, 2023) (collecting cases and explaining that "the guidelines for methamphetamine mixture will, in *all* methamphetamine cases, more closely approximate a sentence that would achieve the objectives of § 3553(a)." ); *United States v. Bean*, 371 F. Supp. 3d 46, 54-56 (D.N.H. 2019) (finding that the guidelines' harsher treatment of actual methamphetamine as compared to other drugs, including both powder and crack cocaine, heroin, and fentanyl, "is unsupported by empirical data and runs contrary to the 'need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct'"; *United States v. Moreno*, 583 F. Supp. 3d 739 (W.D. Va. 2019), in which a policy disagreement with Sentencing Guidelines for methamphetamine offenses supported downward departure from Guidelines range of 135-168 months to 36 months; *United States v. Harry*, 313 F. Supp. 3d 969, 973 (N.D. Iowa 2018) ( "Is ice methamphetamine more than twice as potent, dangerous, destructive or addictive than heroin? I am aware of no objective evidence— from the United States Sentencing Commission or otherwise—supporting such a proposition."). *See also United States v. Carrillo*, 440 F. Supp. 3d 1148, 1154-55 (E.D. Cal. 2020); *United States v. Ferguson*, 2018 WL 3682509, at *4 (D. Minn. Aug. 2, 2018); *United States v. Hayes*, 948 F. Supp. 2d 1009, 1026 (N.D. Iowa 2013); *United States v. Hoover*, 2018 WL 5924500, at *4 (D. Idaho Nov. 13, 2018); *United States v. Hartle*, 2017 WL 2608221, at *4 (D. Idaho June 15, 2017); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1257 (D.N.M. 2017); *United States v. Johnson*, 379 F. Supp. 3d 1213, 1226 (M.D. Ala. 2019); *United States v. Nawanna*, 321 F. Supp. 3d 943, 955 (N.D. Iowa 2018); *United States v. Pereda*, 2019 WL 463027, at *4 (D. Colo. Feb. 6, 2019); *United States v. Robinson*, 2022 WL 17904534, at *3 (S.D. Miss. Dec. 23, 2022); *United States v. Rodriguez*, 382 F. Supp. 3d 892, 897-98 (D. Alaska 2019); *United States v. Saldana*, 2018 U.S. Dist. LEXIS 110790, at *7-10 (W.D. Mich. July 3, 2018).

In this district too, large scale methamphetamine cases can result in significant downward variances. In *United States v. David Campoy* (sentenced June 3, 2025) a defendant who was convicted of possessing approximately 305,000 grams (672 pounds) of methamphetamine and 3.8 kilograms of heroin, and to being a felon in possession of multiple loaded firearms was sentenced to 144 months in custody, well below his 262-327 month guideline range. See, 5:20-cr-00458-BLF-1, Dkt. 613 at 2 (Gov't Sentencing Memo, discussing Sentencing Commission data on average sentences for mixed and pure methamphetamine guidelines).

### 1. History Of The Methamphetamine Guidelines

The Commission did not exercise its institutional role and rely upon empirical data to develop the guidelines for drug-trafficking offenses. *Kimbrough*, 552 U.S. at 96. Instead, it chose to "key the Guidelines to the statutory mandatory minimum sentences that Congress established for [drug offenses]." *Gall*, 552 U.S. at 46 n.2. When the Sentencing Guidelines were first released in 1987, there were no mandatory minimums or meth-specific offense levels. They treated 1 gram of meth as the equivalent of 2 grams of cocaine or 0.4 grams of heroin.[3] In theory, this was a value judgment that 1 gram of meth was twice as dangerous as cocaine, but only 4/10ths as harmful as the same weight of heroin. Yet over years of persistent upward political, Congressional directives, meth punishments increased exponentially relative to these other serious drugs, largely due to Congress's decisions about what quantities should trigger mandatory minimums.

Quantity-based mandatory minimums originally came out of the Anti-Drug Abuse Act of 1986. Congress established ten-year mandatory minimums to target "kingpins"—the "masterminds who are really running the operations."[4] The Sentencing Commission responded to methamphetamine mandatory minimums "by incorporating these statutory penalties into the drug trafficking guideline" at the offense levels that the five and ten year mandatory minimums for other drugs corresponded to (26 and 32).[5] These changes, which upended the original ratios between substances, were based on no new empirical evidence. In 1996, Congress directed the Commission to amend its guidelines and policy statements "to provide for increased penalties for unlawful manufacturing, importing, exporting, and trafficking of methamphetamine. …" The Commission shall ensure that the sentencing guidelines "… reflect the heinous nature of such offenses, the need for aggressive law enforcement action to fight such offenses, and the extreme dangers associated with unlawful activity involving

---

[3] United States Sentencing Commission, *Methamphetamine, Final Report 1999* (November 1999), at 7-11, https://www.ussc.gov/sites/default/files/pdf/research/working-group-reports/drugs/199911_Meth_Report.pdf

[4] U.S. Sent'g Comm., Cocaine and Federal Sentencing Policy (Feb. 1995), at 119 (quoting 132 Cong. Rec. S. 14,300 (Sept. 30, 1986)), https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/drug-%20topics/199502-rtc-cocaine-sentencing-policy/1995-Crack-Report_Full.pdf

[5] U.S. Sent'g Comm., 1999 Meth Report, *supra* note 3 at 8.

DEF. SENT MEMO
*SALAMANCA-BENITEZ*, CR 22–397 JSC

methamphetamine."[6] For *no other reason* than Congress's desire, the Commission cut in half the quantity cut-offs for meth mixture, effectively doubling offense levels.[7] In 1999, Congress again increased the penalties for methamphetamine at the urging of the Justice Department—cutting in half the quantities triggering mandatory minimums to the 5 and 50 grams quantities they are today.[8] The Commission responded by "conform[ing]" the methamphetamine guidelines to the new mandatory minimums.[9] And the record is crystal clear that this was a political act, not one that was based on data or experience: the Commission explained that "un-linking the Drug Quantity Table from the mandatory minimum quantities established by Congress in a manner that reduces sentences would vary from past practice of the Commission *and may prove politically unwise*."[10]

For pure meth, these political pushes created astounding disparities: it is now punished more harshly than heroin by a factor of 20:1; more harshly than powder cocaine by a factor of 100:1; and more harshly than crack cocaine by a factor of 5.6:1.[11] Indeed, pure meth is punished more harshly than fentanyl by a factor of 8:1, notwithstanding that fentanyl is currently fueling an overdose crisis in our country.[12] Actual methamphetamine is now punished at a 10:1 ratio with meth mix, despite no

---

[6] Comprehensive Methamphetamine Control Act of 1996, Pub. L. 104-237, §§ 101-02, 201, 203 and 301; U.S.S.G. App'x C, Amend. 555 (Nov. 1, 1997).

[7] U.S. Sent'g Comm., 1999 Meth Report, *supra* note 3 at 10-12.

[8] *See* Methamphetamine Trafficking Penalty Enhancement Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681 (1998); *see also* H.R. Rep. No. 105-711, pt. 1, at 8 (1998) (setting forth DOJ's position in support of H.R. 3898, a bill similar to the one passed, and its view that penalties for methamphetamine should be the same as crack).

[9] U.S. Sent'g Comm., 1999 Meth Report, *supra* note 3, at 12 n.35.

[10] U.S. Sent'g Comm., 1999 Meth Report, *supra* note 3, at 18 (emphasis added); *see also id.* at 12 n.35. (recognizing that the Commission *could have* gone a different way and set guidelines independently of mandatory minimums, allowing the mandatory minimums to "trump" guideline ranges only in cases in which they exceeded the top of the range).

[11] *See* U.S.S.G. § 2D1.1, app. note 8(D) (Drug Conversion Table).

[12] *Id*., See also CDC, *Understanding the Opioid Overdose Epidemic* (Apr. 5, 2024), https://www.cdc.gov/overdose-prevention/about/understanding-the-opioid-overdose- epidemic.html. The number of overdose deaths from synthetic opioids (including fentanyl) are double that of psychostimulants (including methamphetamine). National Institute on Drug Abuse, Drug Overdose Deaths: Facts and Figures (Aug. 2024), https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates#Fig2

pharmacological differences between the two, and, due to high purity, extremely small quantity differentials between the two (for instance, in this case the weight of the methamphetamine mixture in the first buy was 4,418.5 grams whereas the weight of the actual methamphetamine was a nearly-identical 4,285.9 grams).

### B.     There Is No Rational Distinction Between Pure And Mixed Methamphetamine

The Sentencing Commission's justification for higher sentences based on higher purity is that *unusually* pure substances "indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."[13] This presumption depended upon the idea that each successive layer of middlemen would dilute ("step-on") meth in order to increase the quantity for re-sale, resulting in increasingly diluted drugs as the drugs journeyed to the eventual end user. This assumption was not derived from empirical data and certainly is not supported by what we know about the methamphetamine market today. First, methamphetamine has been uniformly pure for at least 15 years; thus possession of pure methamphetamine is not unusual and does not indicate a higher degree of control within the distribution chain. Second, pure methamphetamine is not necessarily more dangerous or more potent than methamphetamine mixtures.

#### 1.     Methamphetamine In The United States Is Uniformly Pure

In the past, meth in the United States had highly variable purity. In the 1980s, when Congress set the different mandatory minimums for pure methamphetamine versus "a mixture or substance containing a detectable amount of methamphetamine,"[14] average purity hovered at 30–50%.[15] At the time, most meth was manufactured in clandestine labs in the United States,[16] and purity could

---

[13] U.S.S.G. § 2D1.1, app. note 27(C) ("Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs.").

[14] Anti–Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181, § 6470 (Nov. 18, 1988).

[15] *See* Executive Office of the President, Office of National Drug Control Policy, *The Price and Purity of Illicit Drugs: 1981 Through the Second Quarter of 2003*, at 45 (Figure 26) (Nov. 2004) (2004 Price and Purity Report), https://obamawhitehouse.archives.gov/sites/default/files/ondcp/policy-and-research/bullet_3.pdf

[16] 134 Cong. Rec. E2879-02 (Statement of Rep. Bates) (available at 1988 WL 175475).

indicate whether the particular lab was a homegrown or a more sophisticated operation. However, after a crackdown on meth precursors in the 2000s, the practice of home-cooking meth in small labs in the United States plummeted, and smuggling picked up the slack.[17] Now, with the production of methamphetamine taking place almost universally in Mexico in industrial grade labs,[18] that purity disparity no longer exists. As the DEA has explained it: "Gone are the days of domestic super-labs and one-pot labs whose product often averaged 60 percent purity with potency varying upon the manufacturing method. Today's methamphetamine from Mexico comes from mega-labs capable of producing hundreds of pounds of the drug in a single cycle, all with a purity in the upper 90th percentile and potency not far behind."[19]

This pure meth is not being diluted by wholesalers or retail-level dealers. Since 2011, purity of *all* seized methamphetamine – from bulk seizures to street level sales - has exceeded 90 percent.[20] As the Sentencing Commission reported last year, "methamphetamine tested in fiscal year 2022 was uniformly highly pure regardless of whether it was sentenced as methamphetamine mixture (91.0% pure on average), methamphetamine actual (92.6%), or Ice (97.6%)."[21]

---

[17] In 2006, the Combat Methamphetamine Epidemic Act (CMEA) was signed into law, which was designed to reduce explosions and fires occurring in makeshift "cook" operations by regulating ephedrine purchases. Combat Methamphetamine Epidemic Act of 2005, Pub. L. No. 109-177, tit. VII, 120 Stat. 256 (2006). The CMEA appears to have "worked" although it may have merely shifted the production of methamphetamine from the United States to Mexico. *See* DEA, 2*017 National Drug Threat Assessment* at 75–77, https://www.dea.gov/sites/default/files/2018-07/DIR-040-17_2017-NDTA.pdf (reporting that domestic laboratory seizures decreased 67 percent from 2012 to 2016, but seizures of smuggled meth was sharply rising and there was an overall increase in meth distribution); *see also* DEA, 2*020 Threat Assessment* at 22 (Figure 14).

[18] DEA, *2017 National Drug Threat Assessment, supra* note 17 at 67 ("Most of the methamphetamine available in the United States is produced clandestinely in Mexico and smuggled across the SWB. Domestic production continues to occur at much lower levels than in Mexico and seizures of domestic methamphetamine laboratories have declined since 2010."); see also DEA, 2024 *National Drug Threat Assessment* at 2, 31–32 (May. 2024), https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf

[19] DEA, *Methamphetamine Seizures Continue to Climb in the Midwest* (July 10, 2019), https://www.dea.gov/stories/2019/2019-07/2019-07-10/methamphetamine-seizures-continue-climb- midwest.

[20] DEA, *2017 National Drug Threat Assessment*, *supra,* note 17, at 70 (Figure 61).

[21] U.S. Sent'g Comm'n, Methamphetamine Trafficking Offenses in the Federal Criminal Justice System at 4, note 2 (June 13, 2024) (2024 Meth Report), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2024/202406_Methamphetamine.pdf

The sentencing guidelines applicable to meth offenses have not evolved with the meth market. While the Commission's tiered treatment of actual/mixture methamphetamine offenses in the past may have at least appeared logical, "[r]ealities on the ground have since changed." *United States v. Hoover*, 2018 WL 5924500, at *2 (D. Idaho Nov. 13, 2018). Even if it were true in the past that only kingpins had access to highly pure meth, it is not true anymore—now, essentially all meth is pure. In other words, there's nothing "unusual" about highly pure meth in today's market, and certainly nothing that warrants treating actual (tested) meth as ten times more dangerous than an untested mixture with a likely identical purity and near-identical weight.

### 2. Pure Methamphetamine Is Not Necessarily More Dangerous Or More Potent Than Methamphetamine Mixtures.

There is no pharmacological basis for treating pure meth 10 times more harshly than meth mixture. The potency of meth is not directly proportional to purity. "'A lot of people often confuse purity with potency,' DEA Omaha Division Assistant Special Agent in Charge Steve Bell said," as quoted in a 2019 DEA publication.[22] "Purity is exactly that, how pure the actual product is. Potency is the effect the methamphetamine has on your body. It's the determining factor in how high a person will get after using the substance. It's possible to make a highly pure methamphetamine with a low potency that wouldn't cause much effect to the body."[23] Meth mix, even if less pure, is not necessarily less potent than meth actual. However, since approximately 2012, in lockstep with the centralization of methamphetamine production in Mexico, methamphetamine has had a uniform potency.[24]

As for dangerousness, the chemical structure of the methamphetamine is the same whether it is pure or mixed with something else. By 1999, the Sentencing Commission had already determined and reported to Congress: "Methamphetamine-Actual and –mix are not different forms of substance

---

[22] U.S. Sent'g Comm., 2024 Meth Report, *supra* note 3, at 9 (Figure 3) (illustrating purity versus potency).

[23] *Id*; see also *United States v. Rodriguez*, No. 3:17-CR-00031-TMB, 2019 WL 1508036, at *3 n.27 (D. Alaska Apr. 5, 2019) ("[D]ue to changes in how methamphetamine is synthesized, '. . . increase[s] in purity do[] not always translate to an increase in potency.'").

[24] DEA, 2017 National Drug Threat Assessment, *supra* note 17 at 70, fig. 61.

DEF. SENT MEMO
*SALAMANCA-BENITEZ*, CR 22–397 JSC

but rather are [merely] alternative methods of measuring the severity of the offense …"[25] But cutting agents are highly variable. So while pure meth is capable of being more dangerous than a particular low-purity meth mixture, a meth mixture— depending on the cutting agent—can be far more dangerous.[26]

### 3. The Court Should Begin With The Meth Mixture Guideline Range To Avoid Unwarranted Sentencing Disparities

Today, it is almost unheard of for methamphetamine to be below the 80% threshold necessary to qualify for the actual meth guideline. Because seized methamphetamine is uniformly pure, the only factor that determines whether the mixture or actual guideline will apply is whether the DEA opts to test a specific batch, but testing rates also vary greatly between judicial districts. "The proportion of methamphetamine offenses involving laboratory testing ranged from less than 60 percent of the offenses sentenced in the district courts of the Sixth, Seventh, and Tenth Circuits, to more than 80 percent of the offenses sentenced in district courts of the Fifth and Ninth circuits."[27] Had Mr. Salamanca-Benitez been charged in Arizona for the same offense, the chances he would be subject to the higher "meth actual" guidelines would plummet. Thus, the presence of the lab reports in this case results in an arbitrary re-structuring of the Guidelines relative to other similarly situated defendants, and that disparity is exacerbated by inconsistent rates of testing between Circuits.

## II. Methamphetamine Quantity Is Now Less Probative Of Role In The Distribution Chain

Part of the justification for higher sentences based on quantity is that possession of a large quantity indicates a position of power and control within a drug trafficking organization. Drugs are

---

[25] *Id*. at 14, fn 40.

[26] *See* Clare Cole et al., *Cut: A Guide to Adulterants, Bulking agents, and other Contaminants found in illicit drugs* (April 2010) (discussing adulterants that have been found in meth, including (among other things) lead), https://www.health.ny.gov/diseases/aids/consumers/prevention/oduh/docs/cut.pdf; Alpas Wellness, *What is Methamphetamine Cut With?*, https://alpaswellnesscenters.org/methamphetamine-treatment/what-methamphetamine-is-cut-with/ (last visited August 27, 2025) (describing cutting agents, which range from inert to poisonous). Indeed, one study funded by the Department of Justice noted that "[m]ethamphetamine itself [was] the final and least hazardous substance involved in" production of meth by small toxic laboratories within the United States, which have largely been replaced by imported meth. Hunt et al., *Methamphetamine Use: Lessons Learned*, at 26, (Feb. 2006), https://www.ojp.gov/pdffiles1/nij/grants/209730.pdf.

[27] U.S. Sent'g Comm'n, 2024 Meth Report at 30.

expensive and a person lacking status in an organization would not be entrusted with something worth that kind of money. That is no longer the case when it comes it methamphetamine.

The shift from domestic production to importation of methamphetamine from Mexico has resulted in an oversupply of the drug.[28] That oversupply has resulted in prices for methamphetamine plummeting: in July of 2007, the price for a pure gram of methamphetamine was $270.10,[29] in 2020 the DEA in El Paso reported sales of meth for $4 per gram,[30] and in this case, the price per pure gram was $2-3. *See e.g.* PSR 11. A recent article about fentanyl smuggling explained that fentanyl, a synthetic (versus plant-derived) drug, could "be replaced quickly. If a load gets intercepted at the border, traffickers do not have to wait for plants to grow the way they do with cocaine or heroin — they just mix up a few chemicals and send over a new batch."[31] The same is true for methamphetamine. And given this reality, "[l]osing product is relatively unimportant."[32]

Unlike when the guidelines were enacted in the eighties or when penalties were increased in the 90s, under current conditions a man of no means, no power, and little demonstrable reliability like Mr. Salamanca-Benitez - a man who spent the year before the crime working at a Panda Express and living with his cousin, who suffered from drug and gambling addictions - can be fronted a significant quantity of methamphetamine. Mr. Salamanca-Benitez knew people involved in drug trafficking from his prior case and his time in prison, but that didn't make him a leader or kingpin. Friends were willing to loan Mr. Salamanca-Benitez 30 pounds of methamphetamine to arrange sales to Individual 1 not because he was a leader, or even objectively trustworthy, but because even if the entire amount was seized by police or he ran off with it, it could be replaced quickly and for next to nothing. Under

---

[28] DEA, 2017 National Drug Threat Assessment, *supra* note 17 at 69.

[29] DEA, *2011 National Drug Threat Assessment*, at 33 (Figure 11), www.justice.gov/archive/ndic/pubs44/44849/44849p.pdf.

[30] Daniel Borunda, *DEA: Meth now primary drug threat in El Paso area as Mexican drug cartels boost production*, El Paso Times (Feb. 27, 2020), https://www.elpasotimes.com/story/news/crime/2020/02/27/dea-meth-now-primary-drug-threat-el- paso-region/4871335002/

[31] Natalie Kitroeff and Robert Gebeloff, *The American Drug Mules Smuggling Fentanyl Into the U.S.*, N.Y. Times (Sept. 28, 2024), https://www.nytimes.com/2024/09/28/world/americas/fentanyl-drug-smugglers-us.html.

[32] *Id*.

the circumstances of the current market and the unique facts of this case, the quantity he possessed (and therefore the guideline range assigned to it) is less probative of his culpability. The Court should vary further downward on that basis.

### III. Even The Mixed Methamphetamine Guidelines Are Out Of Step With Guidelines For Similarly Serious Drugs

The mixed meth guidelines of 151-188 months should be the starting point of the sentencing analysis. But even *mixed* methamphetamine is punished more harshly than other serious but less dangerous drugs, creating an unwarranted disparity between similarly situated defendants. Meth *mixture* garners an offense level 10 times harsher than powder cocaine and twice as harsh as heroin, although the number of meth-related overdose deaths is still much lower than the number of deaths attributed to opioids.[33] Studies further demonstrate that heroin and cocaine users are 400% more likely and 160% more likely (respectively) to require an emergency room visit than comparable methamphetamine users.[34]

As set forth above, Congress set mandatory minimums for methamphetamine in response to unfounded or outdated assumptions about the quantity that renders a defendant a "kingpin" and instructed the Sentencing Commission to repeatedly increase the penalties beyond those set for other drugs, not based on updated evidence but on the political will of the day. Sentencing Commission data shows that many judges find that these meth mixture guidelines alone do not approximate a sentence that would achieve the objectives of § 3553(a). Over the last five years, 50% of defendants sentenced under the mixed meth guideline relevant to Mr. Salamanca-Benitez received a downward variance.[35] The average sentence for all defendants in that category, not only those who received a downward

---

[33] Nat'l Inst. on Drug Abuse, *Drug Overdose Deaths: Facts and Figures*, at Figure 2, https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates#Fig2 (Aug. 2024).

[34] Dr. Paul Hofer, *Ranking Drug Harms for Sentencing Policy*, Johns Hopkins Department of Psychological and Brain Sciences, (May 2015), at 15, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2612654

[35] Judiciary Sentencing Information (JSIN) data; "During the last five fiscal years (FY2020-2024), there were 79 defendants whose primary guideline was §2D1.1 and Methamphetamine was the primary drug type, with a Final Offense Level of 33 and a Criminal History Category of II, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 77 defendants (97%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 118 month(s) and the median length of imprisonment imposed was 120 month(s)." 50% of those defendants received a downward variance. *See* https://jsin.ussc.gov/analytics/saw.dll?Dashboard

variance, was 118 months. *Id*. If Mr. Salamanca-Benitez had distributed an equal number of grams of cocaine instead of methamphetamine, his total offense level would have been 29, and his guideline range would be 97-121 months.

### IV. 96 Months Is Sufficient, But Not Greater Than Necessary

In fashioning the methamphetamine guidelines, the Sentencing Commission allowed political will to supplant proportionality and empirical evidence. Accordingly, courts should rely more heavily on the factors set forth in § 3553(a) in determining the most just sentence. 96 months in prison will best achieve the objectives of § 3553(a) in this case, given Mr. Salamanca-Benitez's crime and his history and characteristics. He fled a poverty stricken and abusive childhood as soon as he turned 18 years old. Immediately thereafter, he began to use drugs and became embroiled in drug trafficking activity. He was sentenced at 21 years old to 50 months in custody for that conduct but received time off his sentence for completing RDAP. If he had been able to stay clean, things might have turned out very differently for him. He was initially successful on supervised release, but relapsed after his return to Mexico and combined with his gambling addiction, created a desperation that made his decision making disastrously shortsighted. Although he played a meaningful role in the distribution of a very large amount of methamphetamine and fentanyl in this case, he also did not own those drugs or control their manufacture, was not a leader or manager, and possessed no weapons. He was 27 years old at the time he committed the offenses in this case. He is still a young man, and an 8-year sentence is more than a quarter of his life at this point, and he will serve more than double the time he served on his prior case. Even taking into account good time credits, it is still 2482 days to reflect on his crimes and choices, and 2482 days during which he cannot control even the most basic human needs: his healthcare, his clothes, his food, and contact with his family. 96 months is sufficient to punish and deter him, to protect the community, and to offer whatever rehabilitation can be gleaned from time in prison.

//

//

# CONCLUSION

For all the reasons set forth above, Mr. Salamanca-Benitez respectfully requests that the Court sentence him to 96 months, followed by 4 years of supervised release, and that the Court take judicial notice of his related supervised release violation in 24-cr-00425-JSC. He respectfully requests that the Court recommend he be housed at FCI Terminal Island and that he participate in RDAP.[36]

Dated:   August 29, 2025            Respectfully submitted,

                                    JODI LINKER
                                    Federal Public Defender
                                    Northern District of California

                                            /S
                                    GABRIELA BISCHOF
                                    Assistant Federal Public Defender

---

[36] Mr. Salamanca-Benitez is aware that he will not be eligible for a sentence reduction but believes he would benefit from RDAP programming regardless.